Receipt number AUSFCC-10748218

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UPSTATE STAFFING INC., | ) | |
|     Plaintiff, | ) | |
| | ) | Case No. **25-1587 T** |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
|     Defendant. | ) | |

## COMPLAINT

Upstate Staffing Inc., ("Plaintiff") files this Amended Complaint against United States of America ("Defendant") for a refund of Employee Retention Credits for the first through third quarters of 2021, and alleges as follows:

## THE PARTIES

1. Upstate Staffing Inc. is a South Carolina corporation with its principal place of business at 4472 Liberty Highway, Anderson, SC 29621.

2. The United States of America is the proper defendant because this Complaint seeks refunds of taxes paid to (and refundable credits owed from) the Internal Revenue Service ("IRS").

3. The Plaintiff has not initiated any other lawsuits in state or federal court dealing with the same or similar facts as this action.

4. A statement required under R.C.F.C. 9(m)(2)(B) is attached as **Exhibit A**.

## JURISDICTION

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1346(a)(1) and 28 U.S.C. § 1491.

## LEGAL BACKGROUND

### Federal Employment Taxes

6. Plaintiff is claiming a refund of Form 941 employment taxes ("Form 941 taxes")

and the refundable Employee Retention Credit ("ERC").

7. Employers are required by law to withhold federal income taxes and Federal Insurance Contributions Act ("FICA") taxes from their employees' wages, remit these withholdings, and report them to the IRS on tax Form 941. The portion of Form 941 taxes attributable to the employees' withholdings is often referred to as the "Trust Fund" portion.

8. Employers are also responsible for paying FICA taxes that they owe, often referred to as the "employer portion," and reporting such taxes to the IRS on Form 941. 26 U.S.C §§ 3102 and 3111.

9. Employers are usually obligated to file with the IRS the Form 941 quarterly. 26 U.S.C § 6011; 26 C.F.R. § 31.6071 (a)-1.

## Employee Retention Credit

10. In response to the COVID-19 pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). Pub. L. 116-136 (Mar. 27, 2020). Section 2301 of the CARES Act provided for the ERC to be issued to eligible employers on qualified wages paid to their employees. Pub. L. 116-136, § 2301. The ERC program was amended and extended under the Consolidated Appropriations Act of 2021, Pub. L. 116-260, § 206 (Dec. 27, 2020), and the American Rescue Plan Act of 2021, Pub. L. 117-2, § 3134 (Mar. 11, 2021), and terminated under the Infrastructure, Investment and Jobs Act, Pub. L. 117-58, § 80604, (Nov. 15, 2021). *See also* 26 U.S.C. § 3134 (codifying section 2301 of the CARES Act).

11. A business that is an eligible employer that pays qualified wages after March 12, 2020, and through December 31, 2021, is entitled to claim the ERC against its Form 941 taxes on the applicable Form 941 return for that quarter.

12. Under section 2301(b)(3) of the CARES Act, if the amount of the credit exceeds

the amount of Form 941 taxes for any applicable quarter, then the excess is treated as an overpayment and refunded to the employer. *See* 26 U.S.C. § 3134(b)(3).

### General Qualifying Requirements

#### *Employer Eligibility*

13. An eligible employer is one that carried on a trade or business during calendar years 2020 and 2021 and, with respect to any calendar quarter for which the business experienced one of the following:

   a. Its operations were fully or partially suspended due to orders issued by a governing authority in response to COVID-19 ("Full or Partial Suspension Test") that limited commerce, travel, or group meetings; or

   b. The business experienced a significant decline in gross receipts ("Gross Receipts Test") for any calendar quarter of 2020 and/or the first three quarters of 2021[1] compared to the corresponding quarter of 2019.

26 U.S.C. § 3134(c)(2).

#### *Qualified Wages*

14. For the purposes determining the ERC for quarters in 2020 and 2021, "qualified wages" includes only the wages paid to their employees (as defined by 26 U.S.C. § 3231(c)), but also expenses the employer paid to provide and maintain a group health plan (only to the extent that the amounts are excluded from the gross income of the employees). 26 U.S.C. §§ 3134(c)(3), (c)(5)(A), (c)(5)(B).

15. However, this term is subject to certain an additional restriction: To claim the credit

---

[1] A business may be eligible to receive an ERC for the fourth quarter 2021 if it qualifies as a "recovery startup business." *See* 26 U.S.C. § 3134(c)(2)(A)(ii)(III). Plaintiff does not qualify as such and thus does not seek an ERC for this quarter.

for quarters in 2021, the employer must have averaged no more than 500 employees in 2019. 26 U.S.C. § 3134(c)(3).

### *Calculating the Credit*

16. For quarters in 2020, the employee retention credit is limited to fifty percent (50%) of qualified wages that an eligible employer pays to an employee in a calendar quarter. 26 U.S.C. § 3134(b)(1). The maximum amount of qualified wages that the credit can be claimed against is $10,000 per employee for the entire calendar year of 2020. 26 U.S.C. § 3134(b)(1).

17. For quarters in 2021, the employee retention credit is limited to seventy percent (70%) of qualified wages that an eligible employer pays in a calendar quarter. 26 U.S.C. § 3431(a). The maximum amount of qualified wages that the credit can be claimed against is $10,000 per employee *per quarter* in 2021. 26 U.S.C. § 3134(b)(1).

## **FACTUAL BACKGROUND**

18. Plaintiff operates a full-service staffing agency in Anderson County, South Carolina. Plaintiff provides staffing in Anderson County and the surrounding area for a variety of industries, including for companies in the light industrial, maintenance, manufacturing, distribution, and clerical services industries.

19. Kelly Davis is Plaintiff's sole owner.

20. Plaintiff had on average less than 500 full-time employees in 2019.

21. Plaintiff paid qualified wages to its employees in 2021.

22. Plaintiff is not a party to any employee leasing arrangement and did not otherwise lease employees.

### **The Relevant Governmental Orders**

23. Between March 13, 2020, and June 7, 2021, several orders ("Relevant

Governmental Orders") issued by South Carolina, significantly limited commerce in ways relevant to Plaintiff.

24. Pursuant to section 16-7-10(A) of the South Carolina Code of Laws, any individual who "willfully fail[s] or refuse[s] to comply with any lawful order or direction of any law enforcement officer," *or otherwise violates any provision of any Order issued by the undersigned in connection with the State of Emergency* "is guilty of a misdemeanor and, upon conviction, must be fined not more than one hundred dollars or imprisoned for not more than thirty days." Executive Order 2021-22.

25. On March 13, 2020, Governor Henry McMaster issued Executive Order 2020-08, declaring a State of Emergency in South Carolina due to the COVID-19 threat.

26. On March 31, 2020, via Executive Order 2020-17, Governor McMaster mandated the closure of "non-essential" businesses, including furniture stores, clothing stores, and department stores. The order defined essential operations and limited non-essential in-person commerce.

27. On April 6, 2020, via Executive Order 2020-21, Governor McMaster issued a "Home or Work" order requiring residents to remain at home except for work at essential businesses or for limited permitted activities. The order formalized restrictions on public movement and emphasized telework for offices. This order was in place through June 7, 2021. Under the order, individuals were required to maintain at least six feet of separation from others outside their household. Businesses had to allow no more than 5 customers per 1,000 square feet of retail space or 20% of the occupancy limit (whichever was lower), prevent customers from congregating within six feet of each other (except for family units), and follow applicable sanitation guidelines from the Centers for Disease Control and Prevention ("CDC") or South

5

Carolina Department of Health and Environmental Control ("SCDHEC").

28. In May 2020, South Carolina issued reopening guidelines for close-contact industries, requiring employers to provide PPE, train staff, and ensure sanitizer use. The guidelines also mandated face coverings for both workers and customers in addition to the existing social distancing requirements.

29. On August 3, 2020, Executive Order 2020-50 consolidated and replaced earlier COVID-19 directives into a single framework. It also mandated the use of face coverings in state government buildings, with limited exemptions, as part of strengthening public health measures. This order was in place through June 7, 2021.

**Plaintiff's Operations Were Impacted by The Relevant Governmental Orders**

30. Plaintiff's ability to provide its services to its customers was significantly hindered by the Relevant Governmental Orders.

31. Because of the Relevant Governmental Orders, Plaintiff's core client industries in South Carolina—including light industrial, maintenance, manufacturing, distribution, and clerical services—were heavily disrupted. Many of these businesses reduced operations or suspended hiring altogether during the pandemic, in part because they had to comply with Relevant Governmental Orders not only in Plaintiff's staffing area, but also across their nationwide operations. Plaintiff's customers reducing or suspending their local operations directly diminished the number of job opportunities available in the region, thus restricting Plaintiff's ability to place employees.

32. Plaintiff could not conduct "comparable" operations remotely because the very nature of its staffing business requires in-person engagement. Unlike professional service providers that could transition to remote work, staffing agencies were particularly limited in their

ability to operate virtually. Core aspects of the placement process—such as candidate screening, interviews, and orientations—were heavily disrupted by the Relevant Governmental Orders, and the types of positions Plaintiff filled could not be performed remotely.

33. Beyond the impact to its services, to comply with the Relevant Governmental Orders, Plaintiff also expended resources that would have otherwise been dedicated to its business lines with heightened cleaning and other COVID-19 protocols in each of its locations. In particular, at some locations, Plaintiff had to screen its staff prior to each shift. Doing so resulted in increased costs (including for staffing, cleaning services, and supplies) and decreased productivity.

34. While some of the Relevant Governmental Orders lifted before the end of the third quarter of 2021, the lingering effects of these Relevant Governmental Orders (and the others that remained in place) restricted Plaintiff even beyond each order listed.

35. The restrictions imposed by the Relevant Governmental Orders affected a significant portion of Plaintiff's business line for the quarters ended March 31, 2021, through September 30, 2021, creating a more than ten percent (10%) reduction in operational capacity for its staffing services.

36. Accordingly, these facts and circumstances show that the Relevant Governmental Orders had a more than nominal impact on Plaintiff's business operations.

37. As a result of this more than nominal impact to its business operations, Plaintiff filed Forms 941-X claiming entitlement to ERCs based on qualified wages as follows:

| Quarter Ended | Qualified Wages | ERC (Excluding Interest) |
|---|---|---|
| March 31, 2021 | $1,872,259.90 | $1,310,581.93 |
| June 30, 2021 | $1,302,211.22 | $911,547.85 |
| September 30, 2021 | $1,287,963.77 | $901,574.64 |
| **Total ERC Claimed (Excluding Interest)** | | **$3,123,704.42** |

38. While Plaintiff applied for and had forgiven a loan under the first round of the

Paycheck Protection Program ("PPP"), Plaintiff did not take into account wages covered by the forgiven PPP loan in its calculation of qualified wages for claiming the ERC.

39. When calculating its ERC, Plaintiff did not take into account wages paid to any party excluded from ERC eligibility pursuant to 26 U.S.C. §§ 51(i)(1), 152(a)(2)(A)–(h), and 267(c), including Plaintiff's owner and her relatives.

40. Despite more than six months having passed since Plaintiff filed these claims, the IRS has yet to refund Plaintiff for these amounts to which it is entitled.

### COUNT I: PLAINTIFF IS ENTITLED TO A REFUND FOR Q1 2021

41. On or before April 30, 2021, Plaintiff filed an original Form 941 for the employment tax quarter ended March 31, 2021 ("Q1 2021").

42. Plaintiff has no outstanding employment tax liability for Q1 2021.

43. Plaintiff paid qualifying wages of $1,872,259.90 in Q1 2021 and calculated an ERC of $1,310,581.93 for the quarter.

44. On or before January 20, 2023, Plaintiff filed a Form 941-X for Q1 2021, claiming a refund of tax and ERC in the amount of $1,310,581.93 plus interest, with the IRS in Cincinnati, Ohio. Attached as **Exhibit B** is a true and correct copy of Plaintiff's filed Form 941-X for Q1 2021.

45. Plaintiff is a qualified employer eligible for an ERC for Q1 2021 under the Full or Partial Suspension Test because it paid qualified wages to employees and the Relevant Governmental Orders had a more than nominal impact on Plaintiff's operations, leading to a partial suspension of its business operations.

46. Plaintiff timely filed its Q1 2021 refund claim on Form 941-X within three years of filing its original Form 941 for this period.

47. More than six months have elapsed since the Plaintiff filed its Q1 2021 refund claim with the IRS, and the IRS has not disallowed or otherwise adjudicated Plaintiff's claim.

48. Thus, Plaintiff is entitled to a refund of $1,310,581.93 plus interest for Q1 2021.

## COUNT II: PLAINTIFF IS ENTITLED TO A REFUND FOR Q2 2021

49. On or before July 31, 2021, Plaintiff filed an original Form 941 for the employment tax quarter ended June 30, 2021 ("Q2 2021").

50. Plaintiff has no outstanding employment tax liability for Q2 2021.

51. Plaintiff paid qualifying wages of $1,302,211.22 in Q2 2021 and calculated an ERC of $911,547.85 for the quarter.

52. On or before January 20, 2023, Plaintiff filed a Form 941-X for Q2 2021, claiming a refund of tax and ERC in the amount of $911,547.85 plus interest. Attached as **Exhibit C** is a true and correct copy of Plaintiff's filed Form 941-X for Q2 2021.

53. By Letter 4384C dated July 21, 2025, attached as **Exhibit D**, the IRS requested that by August 9, 2025, Plaintiff provide a copy of the Form 941-X for Q2 2021 signed by an individual authorized to sign federal tax returns for Plaintiff.

54. Plaintiff's timely response to this letter, attached as **Exhibit E**, was received by the IRS on July 26, 2025. In that response, Plaintiff provided a copy of the Form 941-X for Q2 2021 signed by its president and sole owner, Kelly C. Davis.

55. Yet, by Letter 105C dated August 28, 2025, the IRS disallowed Plaintiff's refund for Q2 2021 because they "didn't receive the supporting documents [they] requested." Attached as **Exhibit F** is a true and correct copy of the letter disallowing Plaintiff's Q2 2021 refund claim.

56. The IRS improperly disallowed Plaintiff's Q2 2021 refund claim because, despite its statement to the contrary, Plaintiff timely provided a copy of the Form 941-X signed by an

9

authorized representative.

57. Plaintiff is a qualified employer eligible for an ERC for Q2 2021 under the Full or Partial Suspension Test because it paid qualified wages to employees and the Relevant Governmental Orders had a more than nominal impact on Plaintiff's operations, leading to a partial suspension of its business operations.

58. Plaintiff timely filed its Q2 2021 refund claim on Form 941-X within three years of filing its original Form 941 for this period.

59. More than six months have elapsed since the Plaintiff filed its Q2 2021 refund claim with the IRS, and the IRS has not disallowed or otherwise adjudicated Plaintiff's claim.

60. Thus, Plaintiff is entitled to a refund of $911,547.85 plus interest for Q2 2021.

### COUNT III: PLAINTIFF IS ENTITLED TO A REFUND FOR Q3 2021

61. On or before October 31, 2021, Plaintiff filed an original Form 941 for the employment tax quarter ended September 30, 2021 ("Q3 2021").

62. Plaintiff has no outstanding employment tax liability for Q3 2021.

63. Plaintiff paid qualifying wages of $1,287,963,77 in Q3 2021and calculated an ERC of $901,574.64 for the quarter.

64. On or before January 20, 2023, Plaintiff filed a Form 941-X for Q3 2021, claiming a refund of tax and ERC in the amount of $901,574.64 plus interest, with the IRS Service Center in Cincinnati, Ohio. Attached as **Exhibit G** is a true and correct copy of Plaintiff's filed Form 941-X for Q3 2021.

65. Plaintiff is a qualified employer eligible for an ERC for Q3 2021 under the Full or Partial Suspension Test because it paid qualified wages to employees and the Relevant Governmental Orders had a more than nominal impact on Plaintiff's operations, leading to a partial

suspension of its business operations.

66. Plaintiff timely filed its Q3 2021 refund claim on Form 941-X within three years of filing its original Form 941 for this period.

67. More than six months have elapsed since the Plaintiff filed its Q3 2021 refund claim with the IRS, and the IRS has not disallowed or otherwise adjudicated Plaintiff's claim.

68. Thus, Plaintiff is entitled to a refund of $901,574.64 plus interest for Q3 2021.

WHEREFORE, Plaintiff prays that this Honorable Court:

A. Award judgment in favor of Plaintiff and against the United States in the total amount of $3,123,704.42, comprising of:

   i. $1,310,581.93 plus interest for Plaintiff's Form 941 taxes/ERC credit for the employment tax quarter ended March 31, 2021;

   ii. $911,547.85 plus interest for Plaintiff's Form 941 taxes/ERC credit for the employment tax quarter ended June 30, 2021;

   iii. $901,574.64 plus interest for Plaintiff's Form 941 taxes/ERC credit for the employment tax quarter ended September 30, 2021; and

   iv. Any other interest, costs and attorney's fees.

B. Grant any further relief this Court may find just and proper.

Dated: September 23, 2025.                    Respectfully Submitted,

                                              */s/ Christina Tallulah Lanier*
                                              CHRISTINA TALLULAH LANIER
                                              D.C. Bar No. 1779680
                                              *On Behalf Of:*
                                              BROTMAN LAW
                                              402 West Broadway, Suite 800
                                              San Diego, CA 92101
                                              Main Office: (619) 378-3138
                                              Facsimile: (619) 378-3039
                                              Email: tlanier@sambrotman.com